Good morning, Your Honors. May it please the Court, my name is Catalina Gracia and I represent the petitioners. I'd like to respectfully reserve two minutes of my time for rebuttal. The focal issue in this case is whether the immigration judge and the Board of Immigration Appeals improperly held that the Department of Homeland Security had the authority to terminate the asylum status and that the Department of Homeland Security had satisfied the notice requirement found in 8 CFR section 1208.24 subsection F. The petitioners contend that this holding by the immigration judge and the Board of Immigration Appeals is fatally erroneous and in direct opposition to the holding in Ajar from the Ninth Circuit Court in 2012. Per the decision in Ajar, it is clear that the Department of Homeland Security and its present organization does not have the authority to terminate asylum grants by the former INS. But they didn't terminate asylum. The Department of Homeland Security merely asked the Attorney General to terminate asylum through – and then IJ held a hearing about it. I'm not sure this notice argument is your best argument, but I – but it seems to me that all we said before was that the USCIS, now part of DHS, couldn't itself terminate asylum. And that's why the BIA remanded the case so that you could appear before an IJ to see whether asylum would be terminated. So I don't understand how the prior case prohibits this procedure. Well, Your Honor, the Department of Homeland Security is not an agent of the Department of – Well, they just merely notified – they just merely notified the Department of Justice of an – you know, that they wanted – so your position is that they must initiate the proceedings also? Well, they must issue the notice, Your Honor. But what possible difference would that make to your client? Your client got a notice and the BIA said, here's a hearing on a specific date in which you can show up and oppose it. How are any substantive rights of your client – see, in Ajar, the wrong person terminated the asylum. Right. But how did – how was your client prejudiced in the slightest by this procedure? Well, it's just procedurally, the proper mechanism for notice would be through the Attorney General. It's what – It's not what the reg says, is it? It is, Your Honor. It is what Congress said, that only the Department of Justice or the AG has the – What does the reg say about who provides the notice? Well, it depends on what regulation we're looking at. But doesn't the reg, in your case, allow – It references the service, Your Honor. The service to provide the notice? It does reference the service, but then the – 8 U.S.C. Section 1158 is the controlling statute, and it says that only the Attorney General has the authority. May terminate? Yes, Your Honor, but – So if I'm being charged with a crime, God forbid, and the U.S. Attorney charges me with a crime, and then an Article III court tries me, what's wrong with that? I think you've got much better arguments in this case. I'd like you to get to them. And I do, and I can get to – But I think the notice is one of them. Yes, Your Honor, and I can get to the other arguments that we are stating in this case. We also feel that the Board of Immigration Appeals erred in concluding that the Department of Homeland Security had met its burden in establishing fraud. We believe that the petitioner's application for asylum was not analyzed properly. The immigration judge used a report provided by the government, an overseas report. That report lacked foundation, and it was used to find adverse credibility as to the petitioner's claim. And that's another issue here that we believe – Was the overseas report the only basis for the finding of adverse credibility? It was not, Your Honor. There was also credibility issues, but they tied back to that report. The report, in essence, stated that documents presented by the petitioners were fraudulent. However, the petitioners do state that they personally didn't receive those documents. They had requested them from Armenia, and they were sent over, and again, with the credibility – The credibility argument of the immigration judge states that there was inconsistencies with dates. However, those inconsistencies were minor. None of them went to the heart of the claim. They were – I think, Sue, what the bad evidence here, the stuff that goes to the heart of the claim, are the claims that the signatures on two of the documents don't match the exemplars and therefore are fraudulent. And Your Honor, if I may ask to that, there is reference to an exemplar. That exemplar was never presented. We don't know as to – we don't know what they're referring to, what the court was referring to when they said exemplars or what the report says. They didn't present exemplars. There wasn't – Did you ask – did you make a request for the exemplars in the – before the IJ? Well, before the IJ, we asked for – we did actually make an argument as to the exemplars, Your Honor. You made an argument that they weren't there. My question is, the IJ gave you five months to – And we presented documents. We presented additional rebuttal documents, but we – there was no exemplar that we could produce. But I have a very specific question. It may not be important, but I just want to ask it. Did you – did you ever ask for the exemplars? Did – the petitioner – The petitioner. Yes, they did ask for the exemplars. Tell me we're in the record they asked for the exemplars. Oh, no. I'm sorry, Your Honor. We asked the petitioner for the exemplars. To clarify, yes. It's a strange case. You're petitioning for asylum also. I'm sorry. Yes. So – Did your side ever ask for the exemplars? I don't believe so, Your Honor. However, the issue did come up. We did mention the exemplars. You argued that it wasn't reliable because we don't – haven't seen the exemplars. Right. You're referring to – as an example, you're saying that signatures don't match, and generally you have two signatures to show that they don't match. In this case, we were just saying that the signatures didn't match, but didn't match what? And so that was the issue. It seems here that this whole hearing, the combined hearing, once Najjar came out, Department of Homeland Security figured out what was going on here, that they needed to have an IJ make a determination on the termination. But also then at that point, your client was reasserting asylum, and so they seem to have blended these hearings into one, and it seems like the termination, the burden of proof was on the government, and for the asylum, the burden of proof is on the petitioner. But whose burden was it to present on – it seems like the burden would have been on the government for the termination in giving the documents or allowing – proving the knowledge – proving that these documents in the ROI were fraudulent.  Yes, Your Honor. It was the government's burden to prove that they were fraudulent, and we don't think they met that burden for – Tell me why. Well, we don't think they met that burden for – one, for example, to go back to the exemplars. They didn't produce exemplars. They didn't even make an attempt to produce the maker of the report. I understand that it's not always reasonable to bring forth the maker of these reports, but there was no attempt even made, and there is case law stating that an attempt needs to be made. I believe the case is Sinapian. It's a 2009 Ninth Circuit case. It says that the government has to make a reasonable effort to afford the alien a responsibility to confront the witnesses. In this case, the maker of the report is the witness, and there was never any efforts made forth to bring that witness. And even when the government presented the report, they referenced three different officers that made the report by name, but they don't give any other information. And then there's an unnamed and unidentified embassy investigator in Armenia, and that's a problem. This person isn't even – So aside from the whole due process arguments that you're making there, you also claim that DHS did not meet its burden of proof because Mr. Gregorian did not know the documents in the ROI were fraudulent, and so it seems like you're claiming that they failed in that regard in showing knowledge. I just wanted to ask you, because the BIA, it did issue an opinion or a decision in the matter of PSH that says DHS doesn't have to prove that the petitioner had knowledge of the fraudulent nature of the documents, and it seems like we're supposed to give reference to the BIA's interpretation of its own regulation. So I'm trying – I wanted to ask you, why should we consider Mr. Gregorian's lack of knowledge? Because you are asserting that he didn't know. Is that correct? Yes, Your Honor, we're asserting that he didn't know, and we're asserting that because he didn't know, he can't be held to have submitted fraudulent documents. If I turn something into a court believing that the documents are authentic, then I didn't have the requisite knowledge that they were fraudulent to have that be an adverse credibility finding. In the first proceeding, the one that was limited to asylum, the IJ thought he could only make – or she, I forget who it was in this case – could only make an adverse credibility determination based on documents if the IJ also found that your client knew that the documents were fraudulent, and the IJ made that determination in the first proceeding. Why doesn't that solve the problem for us? Well, because, Your Honor, the immigration judge didn't analyze why she believed that the – that the petitioners knew that the documents were fraudulent. But didn't she say the first time I asked you if you knew whether these documents were fraudulent, you said, no, I didn't think they were, but I didn't believe you. I found you unbelievable on that issue. Is that sufficient for – to make a finding? No, Your Honor, I don't believe that that's sufficient to make a finding. When you take the totality of circumstances, Mr. Gregorian actually indicated to the judge that he didn't personally obtain the documents, that he had the documents requested from Armenia and they were brought, and he assumed them to be real because of the seal that they had, and that was a seal he had previously been familiar with. So I think – Is there any detail on the record about how he got the documents, who got them for him? No, Your Honor. What his role was in the documents? There's nothing there. He said that his wife, for one of the documents, I believe a document from 2000 or 2005, his wife obtained the documents from Armenia, but he just – all he said on the record, and I can point you to where in the administrative record he said that, he indicated to the court that he did not personally obtain the documents. Isn't the more critical issue the BIA did not adopt the IJ's findings in that regard? Yes, Your Honor, that is a significant point here. However, if we're tying this all back to fraud and the adverse credibility, the IJ relied heavily on this report to find adverse credibility, and then that affected the rest of the proceedings, specifically when we get to his cat claim, it was denied without a separate analysis as to the actual cat claim, simply because the judge said that there was an adverse credibility and she tied that all back to these fraudulent documents. So there was a lot of – But did your client – I mean, put aside all the adverse credibility, did your client produce sufficient evidence to support a cat claim? Yes. On torture, not on persecution, on torture. Yes, Your Honor, he was – he presented documents showing that he had been arrested twice in Armenia. On one occasion, he was held for two days and he was beaten, he suffered a concussion, he went to the hospital. We produced hospital records. The second – Does that – does that compel a finding of fear of torture as opposed to a finding of fear of persecution? Yes, because he was held for 40 days at one point. He was physically assaulted while in custody, and this is by the acquiescence of the government or the government acting through the police. And that – it's a matter of opinion, I suppose, but we hold that that is considered torture, being beaten and held in a cell is a form of torture, especially when it's for political activities, and that's a protected ground in an asylum claim. What do you want us to do in this case? Your Honor, I'd like the case to be sent back, to be remanded, and have it reanalyzed and have the report given the proper weight. I believe that it was previously – Do you want to hear a new hearing before an IJ? Yes, Your Honor. At which the government might produce more evidence and the IJ might make a finding whether your client knew or didn't know. But it would also give us the opportunity to present documents supporting our claim and to support – Well, see, you may have that opportunity because we'd remanded on an open record, but you did have that opportunity last time. The IJ gave you five months to find documents. And we did provide documents. We did bring forth rebuttal documents. However, we have to bear in mind that we're seeking documents from – out of the country, and there's issues obtaining documents when we're trying to obtain documents from a government that is unstable in another country, and that does take time. And so we did have five months, but now that we're more clear on what's needed – So your argument is you want to put the burden of proof to the government and then also have more opportunity to respond. You were successful on two of your – challenging two of the points in the ROI. Is that correct? Yes, Your Honor. So – but I guess my question wasn't specific enough. You want a new – obviously want a new hearing about whether asylum should be terminated. Yes, Your Honor. And then I assume you want to be able to argue that if it is, that you're entitled to asylum. Yes, Your Honor, and to the CAT claim. And to CAT relief. And to CAT relief. Okay. That we've analyzed, and we'd like the opportunity to, at minimum, present our case on CAT. But first, your argument, it should have never been terminated. Right. Yes, Your Honor. And then that – I assume – yes, if that threshold issue was decided in our favor, then yes, the rest of it – But this hearing would start all over again. For the time being, would be moved. Right. So the government might be able to come in with a witness that said, yes, I talked to him about the fraud and – Yes, Your Honor, that would give them the opportunity. Okay. You want a whole new hearing. Yes. Reserve your time. Yes. Yes, Your Honor. Good morning, Your Honors. Charisse Pratt for the respondent, William P. Barr. May it please the Court. Your Honors, nothing in the record compels a conclusion contrary to the fact that the Well, let me ask you to address what other judges may be troubled more by other things. I'm looking at the report of investigation, which is the centerpiece of your case, obviously. There's no other evidence of fraud in the case other than this. It comes from Special Agent Little, who is a U.S. CIS assistant, I assume, based where? In Moscow? I'm not sure. Yeah, I'm not sure where. Well, it's on a letterhead that says U.S. Department of Homeland Security, U.S. Embassy Moscow. So I assume Mr. Little is based in Moscow, just for purposes of my question. If I'm not, I'm wrong. He says U.S. CIS Moscow received a request from somebody in Los Angeles to open an investigation. And then he said Moscow forwarded this to local investigators at an embassy in Yerevan, which I assume is in Armenia. The investigators sent the following information, focusing on the signatures, which I think is the real one. The document is altered, as is attested by the fact that the signature on this document does not match exemplars of the former minister's signature. So what he's saying is I'm telling you the document was altered because I called someone and they did an investigation and looked at the exemplars and they didn't match. Is that a fair summary? Well, we don't know how he found out. Well, he doesn't have any personal knowledge, Mr. Little, correct? Presumably he gets his knowledge from talking to others. No, right, he doesn't have any personal knowledge. And he makes a request to local investigators in Yemen, in Armenia. Do we know what the local investigators did? We know what their conclusions were. Do we know what they did? Well, this court in Angov said... I'm not asking what we said in court in decisions. I'm asking you a question about this record. No, we don't know the whole process. We don't know what they did? Of how they came to the conclusion. We don't know how they came to the conclusion other than they say... Compared the exemplars, they compared the signature, they compared the stamp. Do we know whether the investigators themselves compared the exemplars or whether they asked somebody else to compare the exemplars? I don't know that. Is there anything in the record that shows the Department of Homeland Security made an effort to present witnesses to testify on the ROI or about the ROI or produce the exemplars referenced in the ROI? There was not an indication in the record that I saw... Could you speak up a little more? There was not an indication in the record that I saw, but under Angov, this court went through an extensive analysis of why that would be... Is Angov a due process analysis? It does have a due process analysis in there. But Angov was a case about statutory rights of asylum applicants, correct? And it also dealt with... Is that correct? Their posture was different than the posture here because petitioners are asylees and they have already been admitted or it seems like admitted into the U.S. and have lived here for two decades. So we have case law that very clearly establishes that individuals who have been formally admitted into the U.S. have constitutional due process rights. So I'm not sure that I'm persuaded to speak for myself that Angov applies in this case. So I guess maybe let me ask you, I mean, do the petitioners here have constitutional due process rights? They have due process rights and they were accorded due process in these proceedings. They were given a notice of the fact that there were fraudulent documents in the record that went to their role and their membership and they were afforded an opportunity to give evidence to rebut those findings. They did not. So if you say they do, and that distinguishes this case from Angov, I guess how is this case different from all the other circuit cases where courts have found that the admission of documents like the ROI violates the petitioner's due process rights? We have the third, fourth, sixth, and eighth circuit cases that have held that. And I'm just very challenged to find the difference between our case here, the Gregorians, and those cases. Well, in this case, they were able to obtain documents from Armenia and challenge some of the findings in the ROI. When you say they, who's they? The petitioners. Yes, but all of those cases say that they should have been afforded due process rights and the government should have been able to show and prove their case. In this case, they were given this ROI, which is one page, lists four bullet points, and the petitioners, because they also thought they were reasserting asylum, did everything they could. But it relieved the government of their burden to show termination. They would have never had to have shown that they were entitled again for asylum if the termination hadn't been improperly done. And so it seems like there's a lot of confusion and conflating by the government that because this hearing where the IJ was also determining and rubber stamping basically what UCIS had done and then also hearing the reassertion of the asylum, it switched and flipped the burden improperly to the plaintiff. Tell me why that didn't happen. It didn't happen because the DHS properly gave the notice with the additional charges saying that two of the documents that you submitted in an attempt to corroborate your claim about your role and your membership in the PPA were fraudulent. But even Engelhoff said that in cases where people have the status similar to that of the Gregorians, that they are afforded due process rights. That's what all these circuits says. So the burden is on the government, but you just said the government did not produce any witness. Is that correct? Right. Did not produce any exemplar. Is that correct? That's correct. I just relied on the four corners of the document, and just because a petitioner on its own made this extra effort to try to address those allegations. But it seems like there's fundamentally a due process issue that occurred here, but I wanted to hear from you to alleviate that concern that I have of that, and I'll give you one other opportunity before I go into knowledge. I want to stay on this after, so answer Judge McGee's question. Well, two of the underlying documents that the petitioner submitted were fraudulent, the dissolution letter and the charter. Right. And if the only evidence of that is the report, is that correct? Right. But like the court in Engelhoff said, we also rely on country condition reports where we don't produce witnesses. I understand, but the court in Engelhoff, you will admit, was dealing with a case different than this in two ways. Very similar. First, let me just finish. First, the court said Engelhoff had never entered the country and therefore didn't have due process rights, correct? Yes? Yes. And therefore, they were not making a due process decision. They were only making a decision based on the evidence, and whether there was an abuse of discretion by the IJ in admitting the report. You can't be making a due process decision for somebody who has no due process rights. And then the report was a little bit different than this, don't you admit? It was a letter from the State Department. But there were other things. There was other evidence in the record, photographs and things like that, and the court was very careful to say when you put all these together, they meet the statutory requirements of reliability. What we're trying to focus on with these questions is not whether Engelhoff says that hearsay is sometimes admissible and reports are sometimes admissible. We're trying to figure out whether this particular report, in which Mr. Little says, I asked somebody to investigate and they reported back to me with no details about what they did, that the exemplars don't match, is enough. So focus on this report. Why doesn't that deprive, because it's the central allegation in the case, why doesn't that deprive the other side of the ability to put on a fair defense? Because, as they did, they sought other documents from Armenia and they produced them, and they did overcome some of the evidence of fraud, but not all, and they did not explain or rebut those two findings. How would the petitioners, how are they supposed to rebut the report if it did not have a fair opportunity to ask questions of the people who made the reports about the investigation or compare the documents? But we could say the same thing about country condition reports. Nobody gets to question who made the reports. But country condition reports have great detail. They're prepared by people with first-hand knowledge or at least who deal with first-hand knowledge of the circumstance. Here, I mean, I know it's not this report, but let me just give you a hypothetical. Let's say Mr. Little said, I asked an investigator, he called another investigator, he called a third investigator, he called a fourth investigator, and the fourth investigator said the exemplars don't match. Would that be admissible? Well, you know, the hearsay rules don't apply in immigration court, and it's just a court of the weight. But Hengoff addressed that. They said, okay, if you put a witness in, then you can always say, well, the witness didn't do this or the witness spoke to that. You can always question. It just goes on and on and on. Would that report that I just hypothesized for you be admissible to terminate asylum? It would be admissible, but as to the weight it's given in light of all the other evidence. And here there were so many inconsistencies where, you know, I mean, off by a year, where with respect to, let's see, his membership card, when he joined the PPA. Well, this case went on over a long period of time, too long in my view, but that's another story for another day. You say there were many inconsistencies. There were really only a few, and some of them were quite minor. Frankly, asking someone to remember something that maybe happened 5, 10, 15 years ago, that's fairly minor, isn't it? We really have two major inconsistencies that the IJ relied on, don't we? Several. What did you consider the most major? What did the IJ consider? Well, they said that when he joined the PPA, was it June 1998, was it August 2000, the membership card. That doesn't go to the heart of his claim. It does. What goes to the heart of his claim is the notion that the documents that he presented were fraudulent. Correct? His inconsistencies also go to the heart of his claim. That's on the asylum claim, on the termination claim. On the termination. The termination claim. Your case rests on this ROI, does it not? In the absence of the ROI, you have no termination case, do you? That's what provoked the termination. You went to a hearing. It was the fraudulent documents. You had the burden of establishing fraud. It was the fraudulent documents, yes. And what you did was the way you tried to meet that burden was to introduce the ROI, correct? Yes. So if the ROI doesn't establish fraud or if the ROI is defective in some way, you don't have a fraud case, do you? No. If the government hasn't met its burden with respect to the ROI documents, then. . . Because that was the only thing you really submitted to terminate asylum. You submitted lots of evidence. That's correct. In response to his request, even if it's terminated, I should get relief. Do you understand? We don't even get to that if his termination was not proper. Right. That's the point I kind of wanted to draw out here a little bit today. I know you refer to the country reports and say, but the country reports are different. The country reports are what petitioners present when they have the burden to show that they shouldn't be deported back to a country. So I'm not sure that that's the proper or the best response to compare that to the ROI. Let me ask you, because you argue in your brief that the DHS doesn't have to show that petitioner knew the documents were fraudulent. And I just want to press you a little bit on that because I'm just wondering, you know, is that true or can we say that when the plain language of the regulation says the government has to show fraud, I mean, doesn't fraud always involve a mens rea element? Fraud does involve a mens rea element, but here they do give him like a second bite where they say just because there's fraud doesn't automatically doom your application if you didn't know about the fraud. I'm looking at the INA section involving asylum, USC 1158DC6 says, if the attorney general determines that an alien has knowingly made a frivolous application for asylum, the alien shall be permanently ineligible for benefits, any benefits under this chapter. And then 1158B2 says the attorney general may by regulation establish additional limitations and conditions consistent with this section. You mentioned frivolous, but they didn't make a frivolous finding here. I understand that, but presumably these two provisions govern the regulation at issue here involving the termination of asylum because of fraud, but you tell me if you disagree. I'm just trying to figure out how can you say the regulations do not require DHS to prove knowledge when the INA provision require the individual to have knowingly submitted the fraud application and we have to read the regulation in light of the INA language. Well, the immigration judge did find that based on his adverse credibility, also his inconsistency. But the BIA did not. And you agree with me on that, right? Yes. And we're looking at what the BIA. So we can't, in this case, we can't find as a matter of fact that, and I'll mispronounce his name, that the, I wanted to call him the petitioner, but he's not really, that the claimant in this case knew that these documents were fraudulent. Is that right? That's correct. Because the BIA did not adopt the IJ's finding. And so, and the law of our circuit in this area is that mere existence of fraudulent documents is not enough to deny asylum, correct? Correct. So my question is, then how can mere existence of fraudulent documents be enough to terminate asylum? Because the petitioners shown the fraudulent documents and given an opportunity to get evidence to rebut them. And he did rebut some of the fraud, but not all of it. So, but we're asking a different question. We're asking whether or not, let's assume I innocently get a bunch of fraudulent documents, right? I send back to the embassy in my home country and I say I need the following and they send me a bunch of fraudulent documents. I don't know they're fraudulent. I submit them and get asylum. In your view, and let's assume the government stipulates that I don't know they're fraudulent. May the government terminate asylum under the circumstances? Oh, if the documents that support the asylum. Turn out to be fraudulent, but I had no idea they were fraudulent. Yes, then, but his whole grant of asylum is based on fraud. Okay, so you're. Whether he knew that or not, that part. So your position is that the regulation. Allows the government to terminate asylum, even when the petitioner has himself done nothing wrong to get the asylum. Just that. It was based on fraud. Okay, so we have an 8th Circuit case the other way, don't we? And the 8th Circuit say, no, you can't do that. You have to show that he knew fraud means that he knew. Correct? Yes, that's that. So what just what Judge McGee is asking you is how can you defend that position in light of. Because the regulation is promulgated pursuant to the statute. And the statute seems to be talking about a frivolous application. When the petitioner makes a frivolous application. So why does why why does why is PSH right in your view? For the proposition that. That no knowledge is needed. Now, it may not matter in this case because we may have a. If we send back for another hearing, you can establish whatever you want to establish. But on this record, you concede that there's no finding by the BIA that he had actual knowledge of the falsity of these documents. So, I mean, the BIA, the board adopted and affirmed pursuant to matter of rebuttal. But then they kind of did delineate some of the arguments that they understand. There's a different rule for finding an adverse, adverse credibility based on documents. I mean, that's the one that the judge applied the first time. I can't find you that you don't have credibility simply based on a document. Unless I also find that you had knowledge of the falsity of the document. That's a separate issue. We're just talking about termination right now. Your position is that that. Asylum may be terminated because the petitioner obtained it by by submitting documents that later turned out to be fraudulent in the absence of any fault by the petitioner. Is that the government's position? I wouldn't say it exactly like that because he is given an opportunity to overcome the fraud with with new documents. It's not like. No, but let's assume that he can't because when he goes back to the agency, they say, you're right. Well, yes. For him, we sent you fraudulent documents. Your position is that even in the absence of his knowledge at the time, the documents were submitted that they were fraudulent. He's perfectly innocent. You nonetheless get to terminate asylum. If that asylum was based on those documents, if those documents would not have gotten asylum, then yes. Yes. My question is, yes. Yes. OK. So your position is that you can deny someone asylum when they know they've committed something fraudulent. Right. In their application. But you don't require that same level of knowledge of fraud when you're terminating asylum because some documents turn out to be false and they didn't know about it. Did I say that right? An opportunity to overcome it. And you've given them an opportunity. Yes. Assume you've given them an opportunity. You still believe there's a distinction between denial and termination. Legally, with respect to whether that should be granted or not. I might, I don't know. I'm a little bit confused. Can you just say it again, please? I'll try. OK. Your position is that the government must show that a petitioner, when denying asylum, that the petitioner knowingly submitted false documents. But when you're terminating asylum, you don't need to have that full finding like you do with denial. You can terminate without the petitioner having knowledge, and you justify that because you've given them an opportunity to... Overcome the fraud. Overcome the fraud. Right. And if they fail to overcome the fraud... You view those two situations differently, yes? I don't know if I, I would rather have like some briefing on this rather than to just say this off the top of my head at oral argument when this did not come up in the briefing. That's fine. Thank you. Thank you very much. I know we asked you a lot of questions here. We went well over time. Your Honor, briefly to the matter of the report of investigation and the alleged fraud that was brought forth by the petitioner. There was no efforts made by the DHS to show that he had knowledge of the fraudulent documents. The efforts were focused on the fact that the documents were fraudulent. And I think that's where the people with the Department of Homeland Security's argument fails. Well, does it fail? We may not have to confront it in this case, but I'm interested in it. Let's assume somebody comes in and seeks asylum and presents fraudulent documents. Yes, Your Honor. He doesn't know they're fraudulent. But in the absence of those documents, he has no claim to asylum whatsoever. Yes, Your Honor. The truth is that he would not be entitled to asylum. Why can't the government, years later, when it discovers the documents are fraudulent, say, you know, you may not have been at fault, but the conditions that led us to give you asylum didn't exist? Now, you may apply for asylum anew, but we want, you know, there's no reason for us to continue to grant you asylum based on that original application. At this point, you can show anew that you're entitled to asylum, but why should we continue to live in a fraud? Well, Your Honor, I think that that argument is a little complicated in this case because this case predates the REAL ID Act. And so the petitioner was able to stand on, in the absence of documents, he would have been able to stand on his testimony and on his statements of what he endured in Armenia. My problem with that is that the IJ found, and I think reasonably, and the BIA found, and I think reasonably, that in the absence of the documents, he would not have been granted asylum. Because of credibility issues, Your Honor, not because of the facts that he presented. Right, right. And then that goes to the minor inconsistencies. But I'm not asking, I understand in this case you have other arguments. I'm just saying the question of whether knowledge is needed strikes me as a little bit difficult because what if later we discover that he never really needed to be granted asylum? He wasn't persecuted. There weren't any of these problems in the country because the documents that he submitted to support them were not accurate. And he's innocent in the submission of those documents. I'm not sure why the government shouldn't be able to say at that point, you're here, let me put you back to ground zero. The original asylum has gone away. Apply for a new one. And that may be the case if asylum was granted simply on the documents that a petitioner or an asylum seeker submits. But that's not the case. There's an interview process. And then in this case, there was also testimony before an immigration judge. So if asylum was granted just simply on documents that are submitted, I can see your point and I agree that the asylum claim needs to be revisited. But in this case, because there's also testimony, even if the documents are fraudulent, there's still testimony that lends itself to support the finding of asylum. And so in this case, whether ultimately this court decides, however this court decides, but if termination is appropriate or if this case is sent back for the immigration judge to reevaluate these facts, nonetheless, the petitioner deserves an opportunity to re-argue his case. Thank you. Thank you. Thank you. Thank you both for your presentations on this interesting case. Ms. Gracia and Ms. Pratt, we appreciate it. The case of Ellen Gregoria v. William P. Barr is submitted.
judges: Murguia, Hurwitz, Zouhary